UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ARTEL HOPKINS,                          :
                                        :
              Petitioner,               :
                                        :                  - 0 8 - 0 0 6 -
      v.                                : CASE NUMBER _____
                                        :
MIKE DELOY, Warden at the               :
Sussex Correctional Institution,        :
                                        :
              Respondent.               :


PETITIONER'S HABEAS CORPUS APPENDIX




PO scanned


Dated: 12/30/07                         _Artel Hopkins_

## TABLE OF CONTENTS

Certified Copy of Docket Entries                    A1-6

Information                                         A7-8

Excerpts of Detective Dan Wright
Trial Testimony                                     A9-13

Excerpts of Raymond Bacon
Trial Testimony                                     A14-16

Excerpts of Pedro Marte
Trial Testimony                                     A17-37

Excerpts of State's Rebuttal Argument              A38

Excerpts of Detective Andrel Martinez
Trial Testimony                                     A39-44

Sentencing Order Dated January 9, 2002             A45-48

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    1
                         ( as of  09/18/2007 )
```

```
   tate of Delaware v.  ARTEL J HOPKINS                      DOB: 07/12/1972
 State's Atty: DAVID HUME , Esq.           AKA: ARTEL HOPKINS
 Defense Atty: JOHN S MALIK , Esq.              ARTEL HOPKINS
```

Assigned Judge:

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 0402002032 | S04020653R1 | TRF.COC.>100 GR | GLTY | 09/20/2004 |
| 002 | 0402002032 | S04020654R1 | PWITDW NSI CS | GLTY | 09/20/2004 |
| 003 | 0402002032 | S04020655R1 | MAINT VEHICLE | GLTY | 09/20/2004 |
| 004 | 0402002032 | S04020656R1 | CONSP 2ND | GLTY | 09/20/2004 |
| 005 | 0402002032 | S04020657R1 | POSS DRUG PARAP | GLTY | 09/20/2004 |

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|
| 1 | 02/19/2004 | CASE ACCEPTED IN SUPERIOR COURT. ARREST DATE: 02/03/2004 PRELIMINARY HEARING DATE: BAIL: CASH BAIL            2,112,000.00 | |
| | 03/04/2004 | ENTRY OF APPEARANCE BY JOHN SANDY, ESQ. | |
| 3 | 03/04/2004 | CERTIFICATE OF SERVICE FILED BY JOHN SANDY | |
| 4 | 03/04/2004 | CERTIFICATE OF SERVICE FILED BY JOHN SANDY | |
| 5 | 03/24/2004 | MOTION TO AMEND TERMS OF BOND FILED BY JOHN SANDY TO BE HEARD 3/26/04 AT 11:00 | |
| 6 | 03/26/2004 | MOTION TO AMEND BOND GRANTED. BOND IS CHANGED TO $5000000.00 SECURED_ON S04-02-0653 AND $400.00 UNSECURED ON ALL REMAINING CHARGES CR-KIMMEL | BRADLEY E. SCOTT |
| 7 | 04/02/2004 | WAIVER OF INDICTMENT & INFORMATION FILED. ARREST DATE +ARRDAT+ | |
| 8 | 05/06/2004 | ARRAIGNMENT CALENDAR - DEFENDANT WAIVED READING; ENTERED PLEA OF NOT GUILTY; JURY TRIAL DEMANDED. CASE REVIEW DATE: 5-17-04 AT 9 A.M. | HOWARD ALICIA B. |
| 9 | 05/19/2004 | CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW. FCR: 7/7/04 AND JT: 7/14/04 | |

CERTIFIED

AS A TRUE COPY

ATTEST: Jayce M. Callea
PROTHONOTARY

PER: Janell Magee
CLERK

A 1

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    2
                         ( as of   09/18/2007 )
```

.ate of Delaware v.  ARTEL J HOPKINS                        DOB: 07/12/1972
State's Atty: DAVID HUME , Esq.               AKA: ARTEL HOPKINS
Defense Atty: JOHN S MALIK , Esq.                 ARTEL HOPKINS

```
       Event
No.   Date        Event                              Judge
-----------------------------------------------------------------------------
10    06/02/2004
          MOTION TO COMPEL FILED BY JOHN M. SANDY, ESQUIRE TO BE HEARD ON
          FRIDAY, JUNE 4, 2004 AT 11:00 A.M.
11    06/04/2004
          MOTION TO COMPEL WITHDRAWN BY JOHN SANDY
12    06/18/2004
          LETTER FROM JOHN MALIK, ESQ TO JUDGE GRAVES.
          RE: A CONTINUANCE REQUEST
13    06/24/2004
          NOTICE OF SERVICE - DISCOVERY REQUEST FILED BY JOHN S. MALIK, ESQ.
14    06/25/2004
          SUBSTITUTION OF COUNSEL FILED BY JOHN SANDY, ESQ. TO REPLACE JOHN
          MALIK.
15    06/28/2004
          SUBPOENA(8) ISSUED.
16    06/28/2004
          SUBPOENA(S) ISSUED.
17    07/14/2004
          CONTINUANCE REQUEST FILED BY THE STATE.
   ..3 08/13/2004
          MOTION TO SUPPRESS FILED BY JOHN S. MALIK, ESQ.
          NOT MOTIONED FOR A SPECIFIC DATE OR TIME, ADVISED  HIS OFFICE TO RE-
          NOTICE.
19    08/13/2004
          MOTION TO COMPEL DISCLOSURE OF CONFIDENTIAL INFORMANT, FILED BY
          JOHN S. MALIK, ESQ.
          NOT MOTIONED FOR A SPECIFIC DATE OR TIME, ADVISED HIS OFFICE TO
          RE-NOTICE.
20    08/13/2004
          MOTION TO COMPEL DISCOVERY, FILED BY JOHN S. MALIK, ESQ.
          NOT MOTIONED FOR A SPECIFIC DATE OR TIME, ADVISED HIS OFFICE TO RE-
          NOTICE.
21    08/13/2004
          LETTER FROM VIOLA E. CASEY(LEGAL ASSISTANT) TO COURT
          RE: MOTIONS FILED.
22    08/19/2004
          SUBPOENA(8) ISSUED.
23    08/19/2004
          SUBPOENA(1) ISSUED.
24    09/01/2004
          MOTION TO SUPPRESS FILED BY JOHN MALIK TO BE HEARD 9/3/04 AT 11:00
25    09/01/2004
```

A2

```
                    SUPERIOR COURT CRIMINAL DOCKET           Page    3
                         ( as of  09/18/2007 )

 state of Delaware v.  ARTEL J HOPKINS                       DOB: 07/12/1972
 State's Atty: DAVID HUME , Esq.           AKA: ARTEL HOPKINS
 Defense Atty: JOHN S MALIK , Esq.              ARTEL HOPKINS

     Event
No.  Date        Event                                 Judge
--------------------------------------------------------------------------
     MOTION TO COMPEL DISCLOSURE OF CONFIDENTIAL INFORMANT FILED BY JOHN
     MALIK TO BE HEARD ON 9/3/04 AT 11:00
26   09/01/2004
     MOTION TO COMPEL DISCOVERY FILED BY JOHN MALIK TO BE HEARD ON 9/3/04
     AT 11:00
27   09/03/2004                                    GRAVES T. HENLEY
     MOTION TO COMPEL GRANTED, STATE TO PROVIDE INFORMATION BY 9/7/04.
28   09/03/2004                                    GRAVES T. HENLEY
     MOTION FOR DISCOVERY GRANTED, STATE TO PROVIDE REMAINING DISCOVERY TO
     DEFENSE WHEN AVAILABLE.  DEFENSE SAID STATE HAD MET MOST OF DISCOVERY
     REQUESTS.
29   09/03/2004                                    GRAVES T. HENLEY
     MEMORANDUM FILED APPROVING MOTION TO SUPPRESS.
30   09/08/2004                                    GRAVES T. HENLEY
     FINAL CASE REVIEW:  NO PLEA/SET FOR TRIAL ON 9/14/04.
     MOTION TO SUPPRESS TO BE HEARD MORNING OF TRIAL.
     CR-WASHINGTON
33   09/08/2004
     SUBPOENA(S) ISSUED.
 32  09/13/2004
     SUPPLEMENT TO DISCOVERY FILED BY DONALD BUCKLIN.
31   09/14/2004                                    STOKES RICHARD F.
     TRIAL CALENDAR/SUPPRESSION HEARING:  MOTION GRANTED
34   09/14/2004
     VOIR DIRE QUESTIONS FILED.
35   09/14/2004
     DEFENDANT'S PROPOSED VOIRDIRE QUESTIONS FILED BY ATTY. MALIK.
36   09/14/2004
     JURY SELECTED.
37   09/14/2004                                    STOKES RICHARD F.
     TRIAL CALENDAR- WENT TO TRIAL JURY
     STOKES/QUINN/REMENTER
     SUPPRESSION HEARING BEGINS.
     JUDGE STOKES GRANTS THE SUPPRESSION MOTION.
     TRIAL BEGINS
     9/15/04 STOKES/WASHINGTON/WILLIAMS
     9/16/04 STOKES/QUINN/WILLIAMS/REMENTER
     9/17/04 STOKES/WASHINGTON/WILLIAMS
38   09/20/2004                                    STOKES RICHARD F.
     JURY TRIAL - DEFENDANT FOUND GUILTY/PSI ORDERED.
     STOKES/KIMMEL/REMENTER
     DEFENDANT FOUND GUILTY_AS TO COUNT #1,#2,#3,#4,#5
```

A3

SUPERIOR COURT CRIMINAL DOCKET            Page    4
( as of  09/18/2007 )

  tate of Delaware v.  ARTEL J HOPKINS                       DOB: 07/12/1972
State's Atty: DAVID HUME , Esq.          AKA: ARTEL HOPKINS
Defense Atty: JOHN S MALIK , Esq.             ARTEL HOPKINS

      Event
No.  Date        Event                              Judge
------------------------------------------------------------------------------
      BAIL IS REVOKED. SENTENCING DATE: 11/12/04
39   09/20/2004
      CHARGE TO THE JURY FILED.
40   09/20/2004
      REVISED COMMITTMENT DEPARTMENT OF CORRECTION.
41   09/20/2004                                 STOKES RICHARD F.
      COMMITTMENT TO DEPARTMENT OF CORRECTION.
42   11/12/2004                                 STOKES RICHARD F.
      SENTENCING CALENDAR: DEFENDANT SENTENCED.
43   12/16/2004
      LETTER FROM CATHY L. HOWARD TO EILEEN KIMMEL
      RE: ADVISING THAT THE TRANSCRIPT MUST BE FILED WITH THE PROTHONOTARY
      NO LATER THAN JANUARY 24, 2005.
44   12/16/2004
      NOTICE OF APPEAL FILED BY JOHN S. MALIK, ESQUIRE
45   12/16/2004
      DIRECTIONS TO COURT REPORTER FOR TRANSCRIPT FILED BY JOHN MALIK, ESQ.
46   03/24/2005
      LETTER FROM DEBORAH WEBB TO EILEEN KIMMEL, CHIEF COURT REPORTER
      RE: THE TRANSCRIPT MUST BE FILED WITH THE PROTHONOTARY NO LATER THAN
      5-4-05.
49   05/06/2005
      LETTER FROM DAVID WASHINGTON TO CATHY HOWARD, SUPREME COURT
      RE:  REQUESTING EXTENSION IN FILING TRANSCRIPT.
50   05/10/2005
      LETTER FROM LISA SEMANS TO DAVID WASHINGTON, COURT REPORTER
      RE:_ REQUEST FOR EXTENSION IS GRANTED, TRANSCRIPT MUST BE FILED NO
      LATER THAN 6/3/05.
47   06/09/2005
      LETTER FROM CHRISTINE QUINN TO CATHY HOWARD, SUPREME COURT
      RE: REQUESTING EXTENTION OF TIME TO FILE TRANSCRIPT
48   06/09/2005
      LETTER FROM LISA SEMANS, SUPREME COURT, TO CHRISTINE QUINN
      RE: ADVISING REQUEST FOR EXTENSION OF TIME TO FILE TRANSCRIPT IS
      GRANTED AND TRANSCRIPT IS DUE NO LATER THAN 7/5/05
51   06/28/2005
      TRANSCRIPT OF PROCEEDINGS (VOLUME A) ON 9-14-04 BEFORE JUDGE STOKES
      FILED BY CHRISTINE QUINN, OFFICIAL COURT REPORTER.
52   06/28/2005
      TRANSCRIPT OF PROCEEDINGS (VOLUME C) ON 9-16-04 BEFORE JUDGE STOKES
      FILED BY CHRISTINE QUINN, OFFICIAL COURT REPORTER.
53   07/01/2005

```
                    SUPERIOR COURT CRIMINAL DOCKET                Page    5
                        ( as of  09/18/2007 )
```

```
  tate of Delaware v.  ARTEL J HOPKINS                        DOB: 07/12/1972
State's Atty: DAVID HUME , Esq.            AKA: ARTEL HOPKINS
Defense Atty: JOHN S MALIK , Esq.              ARTEL HOPKINS
```

```
      Event
No.   Date        Event                                Judge
------------------------------------------------------------------------------
      TRANSCRIPT OF PROCEEDINGS (VOLUME D) HELD IN SUPERIOR COURT ON 9/17/04
      HEARD BY JUDGE STOKES FILED BY DAVID WASHINGTON
54    07/01/2005
      TRANSCRIPT OF PROCEEDINGS (VOLUME B) HELD IN SUPERIOR COURT BY 9/15/04
      HEARD BY JUDGE STOKES FILED BY DAVID WASHINGTON
55    07/01/2005
      TRANSCRIPT OF PROCEEDINGS (SENTENCING) HELD IN SUPERIOR COURT ON
      11/12/04 HEARD BY JUDGE STOKES FILED BY DAVID WASHINGTON
56    07/01/2005
      TRANSCRIPT OF PROCEEDINGS (VOLUME E) HELD IN SUPERIOR COURT ON 9/20/0R
      HEARD BY JUDGE STOKES FILED BY EILEEN KIMMEL
57    07/01/2005
      NOTICE OF APPEAL FILED TO SUPREME COURT. RECORD IS DUE NO LATER THAN
      10 DAYS FROM RECEIPT OF TRANSCRIPT
59    07/07/2005
      LETTER FROM LISA SEMANS(SUPREME COURT) TO COURT RE: ADVISING THE
      RECORD MUST BE FILED NO LATER THAN 7/11/05.
58    07/11/2005
      RECORDS SENT TO SUPREME COURT VIA STATE MAIL
 ʋ0   07/15/2005
      RECEIPT OF RECORDS ACKNOWLEDGED BY SUPREME COURT
61    08/25/2005
      LETTER FROM JOHN S. MALIK TO THE HON. T. HENLEY GRAVES
      RE: REQUESTING THE COURT TO FAX THE NEEDED COURT EXHIBITS FOR THE
      APPENDIX IN SUPPORT OF APPELLANT'S OPENING BRIEF. (GRANTED BY JUDGE
      BRADLEY) FAXED ON 8/25/05.
62    09/19/2005
      LETTER FROM TRACY DOTSON TO SUPREME COURT
      RE: ENCLOSING TWO TRANSCRIPTS, VOLUMES A AND C, THAT WERE NOT SENT
      WITH APPEAL ON 7/11/05
63    03/22/2006
      RECORDS RETURNED FROM SUPREME COURT.
64    03/22/2006
      MANDATE FILED:  JUDGMENT OF SUPERIOR COURT AFFIRMED.
65    07/12/2006
      LETTER FROM JOHN DONAHUE, DAG. TO COURT RE: REQUEST FOR RETURN OF
      EVIDENCE.
66    07/12/2006                                  BRADLEY E. SCOTT
      ORDER:
          WHEREAS THIS 12TH DAY OF JULY, 2006, THE STATE'S REQUEST FOR
      RETURN OF EVIDENCE IS GRANTED. THE PROTHONOTARY SHALL RELEASE THE
      REQUESTED EVIDENCE TO THE CUSTODY OF DETECTIVE DAN WRIGHT OF THE
```

A5

```
                    SUPERIOR COURT CRIMINAL DOCKET            Page     6
                         ( as of  09/18/2007 )

  cate of Delaware v.  ARTEL J HOPKINS                        DOB: 07/12/1972
State's Atty: DAVID HUME , Esq.            AKA: ARTEL HOPKINS
Defense Atty: JOHN S MALIK , Esq.              ARTEL HOPKINS

     Event
No.  Date      Event                             Judge
----------------------------------------------------------------------------
     DELAWARE STATE POLICE.
67   01/29/2007
     MOTION FOR POSTCONVICTION RELIEF FILED.
68   04/27/2007                                  STOKES RICHARD F.
     MOTION FOR POSTCONVICTION RELIEF (R1) DENIED
69   05/21/2007
     LETTER FROM CATHY L. HOWARD TO JOYCE COLLINS
     RE: PURSUANT TO SUPREME COURT RULE 9(B)(II), THE RECORD MUST BE FILED
     WITH THIS OFFICE NO LATER THAN JUNE 11, 2007.
70   06/06/2007
     RECORDS SENT TO SUPREME COURT.
71   06/11/2007
     RECEIPT OF RECORDS ACKNOWLEDGED BY SUPREME COURT.

          *** END OF DOCKET LISTING AS OF  09/18/2007 ***
          PRINTED BY: CSCJMEG
```

A6

PROTH ✓
⑦

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

## IN AND FOR SUSSEX COUNTY

| STATE OF DELAWARE | : | CRA#S |
| | : | |
| v. | : | |
| | : | |
| ARTEL J. HOPKINS | : | |
| ID# 0402002032 | : | **INFORMATION** |

FILED PROTHONOTARY
SUSSEX COUNTY
2004 APR -2  PM 1:03

The Attorney General of the State of Delaware by information makes that **ARTEL J. HOPKINS** did commit the following offenses, to wit:

## COUNT 1- TRAFFICKING IN COCAINE OF 100 GRAMS OR GREATER – S04-02-0653

ARTEL J. HOPKINS, on or about the 3rd day of February, 2004, in the County of Sussex, State of Delaware, did as a principle or an accomplice (under the full definition of 11 Del. Code Section 271) did knowingly and unlawfully possess 100 grams or greater of COCAINE, [a Narcotic Schedule I Controlled Substance, as classified under 16 *Del. C.*, Section 4716(b)(4)] in violation of Title 16, Section 4753A(a)(2)(c) of the Delaware Code.

## COUNT 2- POSSESSION WITH INTENT TO DELIVER COCAINE

### S04-02-0654

ARTEL J. HOPKINS, on or about the 3rd day of February, 2004, in the County of Sussex, State of Delaware, did knowingly and unlawfully possess with intent to deliver COCAINE, [a Narcotic Schedule II Controlled Substance, classified under 16 Del. C. Section 4716(b)(4)], in violation of Title 16, Section 4751 of the Delaware Code.

A-7

## COUNT 3 - MAINTAINING A BUILDING FOR KEEPING CONTROLLED
### SUBSTANCES – S04- 02~0655

ARTEL J. HOPKINS, on or about the 3rd day of February, 2004, in the County of

Sussex, State of Delaware, did knowingly keep or maintain a building (at or about Room 307,

Best Western, Seaford DE) used for keeping or delivering controlled substances, in violation of

Title 16, Section 4755 (a)(5) of the Delaware Code.

## COUNT 4 - CONSPIRACY SECOND DEGREE – S04- 02-0656

ARTEL J. HOPKINS, on or about the 3rd day of February, 2004, in the County of

Sussex, State of Delaware, did when intending to promote the commission of a felony, did agree

with Raymond Bacon to engage in conduct constituting the felony of Trafficking Cocaine, and

did commit an overt act in furtherance of said conspiracy, in violation of Title 11, Section 512 of

the Delaware Code.

## COUNT 5 - POSSESSION OF DRUG PARAPHERNALIA – S04- 02 -0657

ARTEL J. HOPKINS, on or about the 3rd day of February, 2004, in the County of

Sussex, State of Delaware, did use or possess with intent to use drug paraphernalia (to wit:

defendant did possess glass pot, electric burner, spoons and scales) to prepare, process, test,

store, contain, ingest, inhale or otherwise introduce into the human body a controlled substance,

in violation of Title 16, Section 4771 of the Delaware Code.

s/M. JANE BRADY
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

DATED: 4-2-04
clb

A- 8

A-164
WRIGHT - Direct

1    Q    And how long have you been so assigned?

2    A    Nine years.

3    Q    And just briefly, what is the main duties of

4    the Special Investigation Unit?

5    A    We primarily work in an undercover capacity.

6    We investigate the illegal distribution or

7    consumption of manufacturing illegal controlled

8    substances.

9    Q    And you were so employed on February 1st of

10   this year?

11   A    Yes, sir, I was.

12   Q    In late January and early February, did you

13   come to know an individual by the name of Pedro

14   Marte?

15   A    Yes, sir, I did.

16   Q    How did you come to know him?

17   A    I initiated an investigation where Mr. Marte

18   was going to be delivering.  I received information

19   that Mr. Marte was delivering two kilograms of

20   cocaine from New York to a subject in Delaware.

21   Q    And what action did you take in response to

22   that?

23   A    We conducted an investigation, and we were

WRIGHT - Direct

1    able to arrest Mr. Marte in possession of two kilos

2    of cocaine.

3         Q    Was he charged as a result of that incident?

4         A    Yes, he was.

5         Q    Do you remember what the charges were?

6         A    Trafficking cocaine, possession with intent

7    to deliver, maintaining a vehicle, maintaining a

8    building or motel, possession of a firearm during the

9    commission of a felony, and I believe possession of a

10   firearm by person prohibited.

11        Q    And where did this occur?

12        A    In Wilmington.

13        Q    Did you talk to him after that arrest?

14        A    Yes, I did.

15        Q    What was the substance of your conversation?

16        A    In reference to his investigation?

17        Q    Yes.

18        A    Mr. Marte admitted the offenses before him,

19   and to continue the investigation, we asked Mr. Marte

20   if he had any information or anything that would

21   assist the Delaware State Police in furthering the

22   trafficking cocaine investigation.  At which time, he

23   stated that he would like to help out.  He had

WRIGHT - Direct

1    information to provide.

2        Q    At that time, did you make any promises or

3    inducements to him?

4        A    No.   We tell everybody that we will speak on

5    their behalf.   We don't have the authority -- only

6    the Attorney General's Office has the authority to

7    make any kind of promises or any kind of

8    recommendation.   Mr. Marte remained in custody

9    throughout this investigation through the Department

10   of Corrections.

11       Q    And to your knowledge prior to February 3rd,

12   did he have contact with the Deputy Attorney General?

13   Who had authority?

14       A    No, he did not.

15       Q    What did you do with Mr. Marte in early

16   February?

17       A    I did an interview, and during the course of

18   the investigation, it was revealed that there were

19   two other subjects in Delaware that were actively

20   seeking to purchase a quantity of cocaine.   Due to

21   the lateness, or I should say early morning hours,

22   Mr. Marte was transported to the Department of

23   Corrections, and we followed up the following day

WRIGHT – Direct

1    with the investigation.

2        Q    And how did you go about following up that?

3        A    I just responded to the Department of

4    Corrections, pulled Mr. Marte out, and obtained

5    further information about what he had said earlier.

6        Q    Did you come to know the identification of

7    one of these individuals?

8        A    Yes.  One of the subjects was known by the

9    name as Raymond Bacon.

10       Q    And how did your investigation proceed with

11   Mr. Marte?

12       A    After obtaining the information about the

13   subjects that he had contact with prior to his arrest

14   about actively speaking to the purchase of cocaine,

15   it was taking this information, and really, we want

16   to corroborate to be able to follow up, be sure that

17   his information was accurate and correct.

18       Q    How did you corroborate that information?

19       A    We had Mr. Marte -- or I instructed

20   Mr. Marte to place a call to Mr. Bacon.

21       Q    Did you witness him doing this?

22       A    Yes, I did.

23       Q    What did your investigation lead there?

A-169
WRIGHT - Direct

1    known to be a drug dealer?

2        A    Pedro Marte.

3        Q    And what is a "reversal"?

4        A    Reversal is where someone will actively seek

5    to purchase, and they have the means to purchase the

6    cocaine.  We will provide the cocaine for the sale.

7        Q    And did you do that in this case?

8        A    Yes, we did.

9        Q    How did that come about?

10       A    After receiving the conversation and

11   corroborating everything and talking with

12   supervisors, when you first start talking about this

13   quantity of cocaine, you are talking about a large

14   sum of money.

15           Also, the No. 1 concern is officer safety,

16   and actually, the safety of all parties that are

17   going to be involved because you have to take into

18   consideration the amount of money, and there's always

19   the possibility in our mind that someone is going to

20   take advantage of that situation and try not to go

21   through with the deal, but to try to rip one or the

22   other off.

23           If you have two people coming with a large

1    nothing but a normal trip to the store and back?

2         A.   He proceeded from the Best Western to the

3    Wal-Mart and right back, yes.

4              MR. MALIK:   Thank you, Detective.  I have no

5    further questions.

6              Thank you, Your Honor.

7              MR. BUCKLIN:   Your Honor, no further

8    questions.

9              THE COURT:   You may step down.

10             THE WITNESS:   Thank you, Your Honor.

11                                  (Witness steps down.)

12             MR. BUCKLIN:   The State's next witness is

13   going to be Raymond Bacon.

14             THE BAILIFF:   He's on his way up from the

15   holding cell, Your Honor.

16             THE COURT:   May I see counsel at the sidebar

17   just for scheduling.

18             (Whereupon, counsel approached the bench and

19        a discussion took place off the record.  After

20        which, counsel returned to the trial table and

21        the following proceedings were had:)

22                      RAYMOND BACON

23   was called as a witness by and on behalf of the State

DAVID WASHINGTON
Official Court Reporter

$A-14$

B-89

BACON - DIRECT

1    there, you want the same thing to come back out.

2       Q.   The hot plate and you said possibly some

3    baking soda, which bag were those located in?

4       A.   I'm not sure even.

5       Q.   Did you know what was in both bags?

6       A.   Did I know what was in both bags?

7       Q.   Yes.

8       A.   After time went on, I did.

9       Q.   When did you find out what was in both bags?

10      A.   When Pedro opened the bag up.

11      Q.   Was that much later you found out what was in

12   both bags?

13      A.   Not that much later.

14      Q.   But at the hotel?

15      A.   Yeah.

16      Q.   Did Mr. Hopkins say anything when he brought

17   the bags back to the car?

18      A.   No.

19      Q.   Did you say anything to him?

20      A.   No.

21      Q.   Where did you go from that house?

22      A.   To Seaford.

23      Q.   Where in Seaford did you go?

B-90
BACON - DIRECT

```
 1        A.    Best Western.

 2        Q.    What did you do when you got to the Best

 3   Western?

 4        A.    Called Pedro, asked him what room he was in.

 5        Q.    When you went from the house to the Best

 6   Western, who was driving?

 7        A.    Artel.

 8        Q.    When you got to the Best Western, you said

 9   you called Pedro.  Where were you when you called him?

10        A.    The parking lot.

11        Q.    Were you in the van or out of the van?

12        A.    Getting out of the van, probably.

13        Q.    Did you make any other calls?

14        A.    No, not as I know of.

15        Q.    Did you have any problem with your cell

16   phone?

17        A.    Yeah.  Once I was in the room, I did.

18        Q.    Did you have any out in the parking lot?

19        A.    No.

20        Q.    When you called Mr. Marte, what did he say?

21        A.    He told me what room he was in:  307.

22        Q.    What did you say?

23        A.    All right, I be up there.
```

DAVID WASHINGTON
Official Court Reporter

A- 16

C-25

MARTE - Direct

1    Whereupon,

2                      PEDRO MARTE

3    was called as a witness by and on behalf of the State

4    of Delaware and, having been first duly sworn, was

5    examined and testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. BUCKLIN:

8        Q    Good morning, sir.  Will you please

9    introduce yourself for the record and jury?

10       A    My name is Pedro Marte.

11       Q    And where do you currently reside?

12       A    I'm from New York.

13       Q    Right now where are you living?

14       A    I am incarcerated right now in Gander Hill.

15       Q    But prior to that, where were you from?

16       A    Prior to me being incarcerated, New York.

17       Q    Where in New York?

18       A    Manhattan.

19       Q    So New York City?

20       A    Yes.

21       Q    Have you ever been to Delaware before?

22       A    Yes, sir.

23       Q    When were you in Delaware previously?

MARTE - Direct

C-26

```
 1     A     I was incarcerated at SCI.

 2     Q     Do you remember when that was?

 3     A     Yes.  I got incarcerated on September 2000.

 4   I came in.

 5     Q     And why were you incarcerated?

 6     A     For trafficking.

 7     Q     Sorry, trafficking what?

 8     A     Cocaine, crack.

 9     Q     Were there any other charges associated with

10   that?

11     A     No, sir.

12     Q     Was that what you pled to?

13     A     Yes.

14     Q     And what was the weight of the cocaine that

15   you pled to?  Do you remember?

16     A     Fifty to hundred I believe, I'm not sure.

17     Q     And this was in 2000?

18     A     Yes, sir.

19     Q     Did you spend any time in jail as a result

20   of that?

21     A     Yes, sir.

22     Q     How long?

23     A     I did 39 months.
```

MARTE - Direct

1    Q    Have you been convicted of any other

2    offenses in Delaware up until recently?

3    A    No, sir.  That's the only two.

4    Q    After you went back to your mother's house

5    in New York, did there come a time when you returned

6    to Delaware?

7    A    When I was over there, you know, I was just

8    trying to get a job and stuff.  So stuff just got

9    hard, you know.  I had to start -- I went over there

10   on Interstate Compact.  So I had to still pay my

11   fines.  So I just, you know, that's when I came back.

12   Q    When did you come back?

13   A    On January 30th I believe.

14   Q    Where did you return to?  Where did you come

15   to Delaware?

16   A    To Wilmington.

17   Q    And why did you come back?

18   A    I was supposed to do a deal with this guy.

19   Q    When you say "do a deal", what does that

20   involve?

21   A    He was supposed to buy some drugs from me.

22   Q    What kind of drugs?

23   A    Cocaine.

MARTE - Direct

```
 1      Q    How much?  What is the quantity?

 2      A    He asked for a kilo, and then on the way

 3   over there, he said, you know, if you have a little

 4   extra just throw a little bit.  So he was going to

 5   buy one kilo.

 6      Q    But your intent when you entered Delaware

 7   was you were trying to sell two kilos of cocaine?

 8      A    One.

 9      Q    One?

10      A    Yes.

11      Q    Okay.  And what happened when you got to

12   Wilmington and tried to sell this?

13      A    When I entered the room, I went in there,

14   you know, expecting to do a deal, and when the guy,

15   you know, sold the stuff, whatever, the cops just ran

16   into the room, and I got incarcerated.  I got, you

17   know, locked up.

18      Q    You got arrested?

19      A    Yes.

20      Q    Do you remember what the charges were that

21   you got arrested for?

22      A    Got arrested for, I believe, it was

23   trafficking cocaine over hundred grams and committing
```

C-30

MARTE - Direct

```
 1    a felony while having a firearm, and I don't remember

 2    all of them but with the vehicle having stash.

 3        Q    Was that maintaining a vehicle?

 4        A    Yes, I believe.

 5        Q    Were you charged with possession with intent

 6    to distribute that cocaine?

 7        A    I can't remember.

 8        Q    Did you talk to the police after your

 9    arrest?

10        A    Yes, sir.

11        Q    Do you remember the name of the police

12    officer that you spoke to?

13        A    I only remember one.  I don't remember the

14    other one because that is the one that I stood in

15    touch with.

16        Q    What was the name that you remember of the

17    police officer?

18        A    Mr. Daniel Wright.

19        Q    Would you recognize him if you saw him

20    again?

21        A    Yes, sir.

22        Q    Do you see him in the courtroom today?

23        A    Yes, sir.
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A   71

C-31
MARTE - Direct

1    Q    Where is he seated?  What is he wearing?

2    A    He is right in front of me wearing a brown

3    suit.

4         MR. BUCKLIN:  Your Honor, let the record

5    reflect Detective Wright has been identified.  He is

6    the only person on this side with a brown suit.

7    BY MR. BUCKLIN:

8    Q    Do you remember talking to Detective Wright

9    after your arrest?

10   A    Yeah.

11   Q    And what do you recall of that conversation?

12   What happened?

13   A    You know, basically, I was in a lot of

14   trouble for -- plus the fact that I just had come out

15   and already in trouble.  So he basically, you know,

16   made it clear that I was facing a lot of time plus my

17   violation and all that stuff.  So he said, you know,

18   "Would you like to help yourself," and I said, "Of

19   course."

20   Q    What impression did you get that "help

21   yourself" meant?

22   A    Obviously, you know, I was just going to

23   help myself doing whatever I had to do.

C-32

MARTE - Direct

```
1      Q    Did he tell you what to do?

2      A    He asked me do you know, you know, can

3   you -- do you know anymore people here in Delaware

4   that you could bring stuff to.

5      Q    What did you say?

6      A    I said yeah.

7      Q    Did you identify to Detective Wright at that

8   time who you thought you could do that with?

9      A    Excuse me?

10     Q    Did you tell Detective Wright who it was

11  that you knew?

12     A    Yeah.

13     Q    What was the name that you told Detective

14  Wright?

15     A    It was a guy over in Wilmington Reggie,

16  Reggie.

17     Q    Was there anyone in Sussex that you spoke to

18  him about?

19     A    I said Bake.

20     Q    Now is this -- you referred to him as Bake?

21     A    Yes.

22     Q    Is that his full name?

23     A    That's the name I know him by.
```

1    Q    How do you know him?

2    A    Because we did time together.

3    Q    Do you remember when you first met him?

4    A    Yes, it was during -- while I was in the Key

5    Program that I met him, and then I saw him again over

6    in Work Release Center.  I was mandatory building

7    worker, and he was on his way home, and then I met

8    him again.  We got together because we started to do

9    this asbestos class.  We started taking that class,

10   and there was this guy, you know, we just started

11   talking about, you know, just stuff to do when we go

12   home and stuff.

13   Q    When you say "stuff to do when you get

14   home", what are you referring to?

15   A    I'm saying, you know, we was looking forward

16   to, you know, getting jobs and stuff.

17   Q    So at that point, you weren't talking all

18   the time about illegal activity?

19   A    It came up.  It was not something -- it was

20   not a priority because of the simple fact that when I

21   was incarcerated I wasn't thinking about doing this

22   till, you know, I went out there and stuff started to

23   happen that, you know, I had to pay bills, and I

C-34

MARTE - Direct

1    couldn't find a job.  I couldn't find a job in that

2    field because my license was from Delaware.  So I had

3    to change it to New York, and I didn't know how to do

4    it over there.

5         So I went to a couple of jobs to a couple of

6    places where they needed people, filled out some

7    applications, but, you know, they would never call

8    because of the felony stuff.

9    Q    When you returned to New York, did you keep

10   in contact with this person named Bake?

11   A    Yeah.

12   Q    How did you keep in contact with him?

13   A    I just called him.  He was still on the box

14   so he was just, like, he was just laying low.  He was

15   trying do his thing right.

16   Q    Did you talk to him about your situation in

17   New York looking for a job?

18   A    I don't think not like that because our

19   conversation used to be like, you know, they were

20   just quick.  How you doing?  What's up, basically.

21   That's it.

22   Q    How did you know to contact him?  How would

23   you get in contact with him?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER
4 - 25

MARTE - Direct

| | | |
|---|---|---|
| 1 | Q | And you just said that you set up a deal? |
| 2 | A | Yes, sir. |
| 3 | Q | How?  Do you remember the conversation? |
| 4 | A | I remember a little bit of it. |
| 5 | Q | What do you remember of the conversation? |
| 6 | A | It was just basically I was just calling him |

7   to see what he was, you know, what he was up to.

8   Well, I told him that I was coming down this way to

9   do something.  So, you know, if he -- either him or

10  anybody wanted anything, and he said that he -- that

11  his boy might want something, whatever, and then I

12  believe he got in touch with him, and he told him

13  that he wanted, you know, that he was going to try to

14  because prior to -- I don't know how long before the

15  deal that we was going to address the problem with

16  someone else.

17       Q    Did you specifically mention the word

18  "cocaine" during this conversation?

19       A    No.

20       Q    Why not?

21       A    Not -- cause you don't talk like that over

22  the phone.

23       Q    How do you talk over the phone?

C-51

MARTE - Direct

1      A     You know you speak in codes.

2      Q     So when you said "you were coming down this

3   way and if anybody wanted anything," what did you

4   mean by that?

5      A     I was asking him if he knew anybody who

6   wanted anything like they wanted to buy drugs or

7   something so.

8      Q     And do you remember specifically what his

9   response was?

10     A     He said that he had his boy.  His boy, you

11   know, would buy some.

12     Q     And you said something about something

13   wanted to try two?

14     A     Yeah.  Because he said he wanted two.  He

15   had said -- I believe I spoke to him personally over

16   the phone, and he had told me if I wait up.  If it

17   was not over the phone, it was when the stuff

18   happened, but he wanted to because he wanted to try

19   to because couple weeks prior to that day, he had

20   like -- he had gone to another state and had lost a

21   big deal of money.

22     Q     Okay.  Did you talk about price?

23     A     Yes.

MARTE - Direct

1    Q    Did you talk to Bake about price?

2    A    Yes.

3    Q    Do you remember that conversation?

4    A    You know, we was just discussing stuff.

5    Q    How did the discussion go?

6    A    He just told me to give him a number, and I

7    believe I started with 24, and he said you know that

8    was probably too much.  So then I said either 24, 23

9    and a half.  I can't do no better than that.

10    Q    Did he say any numbers, or did he agree to

11    anything?

12    A    You know he said it was good.  That's why

13    everything went down.

14    Q    When you say 23 and a half, exactly what

15    amount of money?

16    A    $23,500.

17    Q    And that's for each kilo?

18    A    Yes.

19    Q    Was there a discussion about where the money

20    was coming from?

21    A    No, we didn't discuss exactly.  His friend

22    was going to get it.

23    Q    How did you know that his friend was getting

1    it?

2        A    Because he had told me during the

3    conversation, you know, that his friend was going to.

4    You know, he was going to try to.  I'm not sure if he

5    was there with him or if he called him, but I know

6    that he was discussing it.  I can't remember.

7        Q    And did he ever mention his friend's name?

8        A    He mentioned it, but I didn't remember the

9    name.  He just mentioned it.

10       Q    Did he mention it during that telephone

11   conversation?

12       A    Yes.

13       Q    And this is the same telephone conversation

14   that the two detectives were monitoring?

15       A    Yes.

16       Q    Did you have -- do you remember if when you

17   heard the name, whatever it was, if you knew the

18   person he was talking about?

19       A    No.  I never met him before.

20       Q    Do you have any concerns in the sale or

21   purchase of cocaine when you are dealing with

22   somebody you don't know?

23       A    No, because it was, you know, it was a

C-54

MARTE - Direct

1    friend of mine introduced me to somebody that he

2    trusts so it was okay.

3         Q    How did you know it was somebody that he

4    trusted?

5         A    Because when he said his name, he also

6    said -- he reminded me you remember the guy I was

7    telling you about.  You know, he had the big rims on

8    the truck, whatever.  I said yeah.  Well that's him,

9    whatever.  I said okay.

10        Q    What plans did you make to exchange the

11   money and the cocaine?

12        A    What plans?

13        Q    Yes.

14        A    Well, I told him I was going to call him

15   when I was around, and that was it.  We set up a

16   time.  I believe it was either one or two.

17        Q    Did he or you ever say what city you were

18   coming down to?

19        A    If I'm not mistaken, I said I was going to

20   make a stop in Wilmington.  No, I think I said -- I

21   am not hundred percent sure -- I believe I said

22   Wilmington and then come down here and keep going

23   down state.  That's, you know, as far as I can

C-55

MARTE - Direct

1   remember.

2       Q    Do you remember whether or not you said

3   anything about a place to meet?

4       A    No.  I just told him when I -- you know,

5   when I'm around, I'm going to give you a call.

6       Q    And was there any response to that?

7       A    He said all right.  He said it was okay.

8       Q    Did you have any other conversations that

9   same day with this person known as Bake?

10      A    Not that I can remember.  I believe I went

11  back to prison after that.

12      Q    What did you have -- what happened?  You

13  said you went back to prison.  Did you see Detective

14  Wright after you went back to prison?

15      A    He took me, and then that was it.  I just

16  had to wait for the next day.

17      Q    So the next day, did you see Detective

18  Wright?

19      A    I saw him in the hotel.

20      Q    Do you remember how you got to the hotel?

21      A    Yeah, I was escorted by another detective.

22  He was playing the part.

23      Q    What part was he playing?

MARTE - Cross

1      A    Yes, sir.

2      Q    You were also aware that you were facing

3    additional time beyond the minimum mandatory time on

4    those charges, right?

5      A    It was just when they told me what I was

6    facing, they didn't make nothing else.  They didn't

7    tell me no other time.  They just said that.  You are

8    facing 18 years in jail minimum mandatory.

9      Q    Eighteen minimum mandatory?

10     A    Yes.

11     Q    Now, in order to avoid -- strike that

12   question.  You ultimately did strike a plea bargain

13   with the State, correct?

14     A    Yes, sir.

15     Q    In that plea bargain, you received a charged

16   trafficking cocaine, right?

17     A    Yes.

18     Q    But it was first level trafficking between 5

19   and 50 grams, right?

20     A    Yes, sir.

21     Q    And on that charge, you only received a

22   three-year minimum mandatory sentence, right?

23     A    Yes, sir.

MARTE - Cross

1    Q    And you received a probationary sentence to
2    follow that as well of three years, correct?
3        A    Yeah, but I received six years suspended
4    after three years mandatory.
5        Q    So that means when it suspended six years,
6    the first three would be in jail minimum mandatory,
7    right?
8        A    Yes.
9        Q    Then the second three years would be served
10   on probation; is that right?
11       A    Yeah.
12       Q    In connection with that case to come down
13   from 18 years minimum mandatory to three years
14   minimum mandatory with three years probation to
15   follow, did you engage in any cooperation with the
16   government, with the State?
17       A    No, sir.
18       Q    They just gave you that deal straight up?
19       A    Because of my lawyer.  You know, I had two
20   lawyers.  So basically they do what they have to do.
21       Q    But it's your testimony that you did not
22   cooperate in any way against any individual back
23   then?

MARTE - Cross

1    So by the time they accepted my probation, I had

2    already been in trouble and made bail and was now

3    working labor in New York.

4         Q    You said you had been working where in New

5    York?

6         A    I was working in a hotel in a restaurant.

7         Q    So when exactly, if you recall, did you get

8    out of jail in Delaware on your -- this would have

9    been the February 2000 trafficking charge?

10        A    December 11th.  I believe it was either

11   December 11th or the 12th.

12        Q    December 11th was that in 2000?

13        A    2003.

14        Q    2003.  Okay.  Then it took approximately

15   three months in order to get picked up with a

16   probation officer in New York to conduct your

17   supervision?

18        A    It took something like that, yes.

19        Q    And you had to make -- write in reports,

20   written reports back to Delaware until -- excuse me.

21   You had a New York probation officer supervise you?

22        A    Yes, I am saying all I did was just write

23   the paper.  That was it.

MARTE - Cross

```
 1        Q    When you did ultimately get a New York
 2   probation officer --
 3        A    Yes.
 4        Q    -- did you meet with that probation officer?
 5        A    Yes, sir.
 6        Q    Did you discuss with that probation officer
 7   your $18,000 fine obligation?
 8        A    I do not remember.
 9        Q    Did that probation officer indicate to you
10   on your first meeting we have to take care of this
11   $18,000 fine?
12             MR. BUCKLIN:  May we approach, Your Honor?
13             (Whereupon, counsel approached the bench and
14        the following proceedings were had:)
15             MR. BUCKLIN:  By my calculation, Your Honor,
16   he got out of jail and went to New York on
17   December 11th of 2003.  And it wasn't until three
18   months later that he got a New York probation
19   officer, that would be January either February or
20   March after this incident.  So I don't see the
21   relevance of anything that happened prior to or
22   including cooperation up to this incident because he
23   never had this conversation with any probation
```

1    Q    You wanted to avoid getting back in the drug

2    business?

3    A    Yes, sir.

4    Q    But here it's your testimony to the

5    prosecutor around about January the 30th of this

6    year, since things were tough and you had to pay this

7    fine, you decided on your own to get back in the drug

8    business, right?

9    A    Yes.

10    Q    This was less than two months after being

11    released from a 39-month prison sentence, right?

12    A    Yes.

13    Q    Now after you were -- when you struck this

14    deal in Delaware with the other individual, you said

15    that you were going to bring down one kilogram of

16    cocaine?

17    A    Yes.

18    Q    And is it your testimony here that from the

19    time you got out on December 11th until this one

20    kilogram of cocaine, you had no other prior drug

21    dealing?

22    A    In New York, I did.

23    Q    When did you start up your drug dealing in

MARTE - Redirect

```
 1      Q    Which one of those did you see him touch?
 2      A    I believe he touched -- I think he looked at
 3    both of them, but I guess he was concerned about the
 4    one that was already open.  I'm not a hundred percent
 5    sure, but I believe he had the one that was already
 6    open.  It was all, you know, messed up.  So I guess
 7    he was checking that one out.
 8      Q    And what happened while he was doing that?
 9      A    That's when the police came into the room
10    and arrested everybody.
11      Q    And you said arrested everybody?
12      A    Yes, sir.
13      Q    They took you back into custody?
14      A    Yes, sir.
15      Q    You didn't receive any charges out of this
16    incident, correct?
17      A    No, sir.
18      Q    Prior to the drugs coming into the room, did
19    you see them?
20      A    Yes.
21      Q    The two kilos of cocaine?
22      A    Yes, sir.
23      Q    Was there anything different in the packing
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

1    bolstered by the corroboration that you find in that

2    video-tape.  If the video-tape were the only evidence

3    that we were going to present to you, this trial may

4    have been different.  It may have been shorter.

5           But I don't know if you would agree or not

6    that you may have more faith in a process when poker is

7    played with the cards up and they are all on the table

8    than when some of them are kept concealed underneath

9    the table and only a few are placed up for you to view.

10          You have seen all of the evidence.  You have

11   seen detailed accounts from the witnesses of what they

12   were doing over the two-day period, and that puzzle

13   shows a picture of Mr. Hopkins -- and you have seen it

14   on the screen -- knowingly in possession of over two

15   thousand grams of cocaine.  Forty-seven thousand

16   dollars of cash was brokered for that deal.

17          He was there because he knew what was

18   happening.  Nobody had to tell him what was happening.

19   He took actions in that room and made statements like

20   "beat for six"; "I am waiting for my guy in Houston."

21   Absent that, if you turned off the sound and watched

22   the choreographed actions that he took in that room,

23   knowing that he does it without instruction, he had to

D-51

MARTINEZ - DIRECT

1    Investigations Unit then on February 3rd of this year?

2        A.    Yes, I was.

3        Q.    Do you remember or did you take part in an

4    undercover operation on that day?

5        A.    Yes.

6        Q.    What were your duties as far as that

7    operation?

8        A.    I assisted Detective Wright with obtaining

9    the cocaine from the Custom's Service in Wilmington.

10   I took custody of it.  I also took custody of a second

11   kilo of cocaine, which was taken from the Superior

12   Court here at the Prothonotary's Office to be used in

13   this investigation.  I assisted him in obtaining a

14   hotel room at the Best Western Lodge, I believe it

15   was, in Seaford, as well as maintaining custody of the

16   cocaine at that time and transporting it to the room

17   upon getting a phone call.

18       Q.    Did you have any role in collecting and

19   cataloging the evidence seized in this case?

20       A.    Yes.

21       Q.    What was that role?

22       A.    Upon executing the arrest of the defendants,

23   I was then in charge with collecting all the evidence

DAVID WASHINGTON
Official Court Reporter

A-39

1    just briefly?

2              THE COURT:   Yes.

3              (Whereupon, counsel approached the bench and

4         the following proceedings were had:)

5              MR. BUCKLIN:   Your Honor, we want to you give

6    you the heads-up.   There is other evidence stickers on

7    the next.   It will be explained that this kilo of

8    cocaine was actually held in the Superior Court.

9              THE COURT:   That was the Bodnari case.

10   Everybody understands this is a reversal.

11             MR. BUCKLIN:   I will ask him quickly about

12   that for the jury's idea.

13             THE COURT:   Sure.

14             MR. MALIK:   No problem with that.

15             MR. BUCKLIN:   I wanted to point that out.

16             THE COURT:   Sure.

17             (Whereupon, counsel returned to the trial

18        table and the following proceedings were had:)

19             MR. BUCKLIN:   Your Honor, I have shown the

20   next proposed exhibit to defense counsel.   If there

21   isn't any objection, I'd like to make it the next

22   State's Exhibit.

23             MR. MALIK:   No objection, Your Honor.

DAVID WASHINGTON
Official Court Reporter

A- 40

MARTINEZ - DIRECT

1                    THE COURT:  It's admitted.

2                    THE CLERK:  Admitted as State's Exhibit No.

3      20.

4                    MR. BUCKLIN:  May I approach the witness?

5                    THE COURT:  Sure.

6      BY MR. BUCKLIN:

7          Q.   Detective Martinez, I am handing you was

8      marked as State's Exhibit No. 20.  Do you recognize

9      what I handed to you?

10         A.   Yes.

11         Q.   What is that?

12         A.   It's a brown evidence bag containing

13     approximately one kilo or kilogram of cocaine, the

14     second kilo.

15         Q.   Did you place this into evidence?

16         A.   Yes.

17         Q.   With the evidence bag?

18         A.   Yes.

19         Q.   Can you please open it and confirm.  Now,

20     Detective, you have taken something out of that

21     evidence.  What is that you got in your hands right

22     now?

23         A.   It's the second evidence bag that contained

1    the same kilo of cocaine from a previous drug

2    investigation that I was involved in as well.  And by

3    looking at it, it's still consistent with the same

4    kilo of cocaine.

5        Q.   The other evidence bag, where is that from?

6        A.   This is a case that has already been

7    adjudicated here in Sussex County.  I believe a 1999

8    case.

9        Q.   How did you come to have these drugs

10   originally?

11       A.   We needed a second kilo.  I was then asked to

12   contact Deputy Attorney General Adam Gelof here in the

13   Attorney General's Office and attempted to obtain the

14   second kilo.  That's how we obtained this one.

15       Q.   What did you do to obtain this second kilo

16   from Deputy Attorney General Adam Gelof?

17       A.   Can I take a look at it to refer --

18       Q.   You need to refer to notes?

19       A.   Yes.

20       Q.   If that refreshes your recollection, please

21   read them and let us know if your recollection is

22   refreshed.

23       A.   Mr. Gelof wrote a motion for release of

DAVID WASHINGTON
Official Court Reporter

$A - 42$

1    evidence, dated February 3rd, 2004, requesting that

2    this particular kilogram be released from the

3    Prothonotary's evidence locker to the Delaware State

4    Police to be used in this drug investigation.

5        Q.    To your knowledge, was that motion granted?

6        A.    Yes, it was.

7        Q.    What did you do after that motion was

8    granted?

9        A.    I was taken to the evidence locker here in

10    the Superior Court.  The kilogram was taken out of the

11    locker, at which point, I took pictures of it when it

12    was taken from the locker and then I transported it to

13    the motel in Seaford, at which time I processed the

14    kilogram to remove some of the evidence tape so that

15    we can -- obviously, in this particular investigation,

16    we didn't want evidence tape all over the kilogram of

17    cocaine.

18        Q.    Why not?

19        A.    We wanted to give the impression that the

20    subjects involved in this case were getting an actual

21    kilo of cocaine from a street dealer and no evidence

22    from the Delaware State Police.

23        Q.    And did you keep this kilo of cocaine in your

DAVID WASHINGTON
Official Court Reporter

$\mathcal{A} - 43$

MARTINEZ - DIRECT

1    possession and custody?

2        A.    Yes.

3        Q.    Did there come a time when the kilo of

4    cocaine was out of your possession and custody?

5        A.    Yes, sir.

6        Q.    When was that?

7        A.    The two kilos of cocaine were in my custody

8    until I would receive a phone call from Marte, who

9    then asked me to respond to his room.  At which time,

10   I took both kilos of cocaine in plastic bags and

11   handed it to him and returned back to the room.

12       Q.    Were you able to see in the room at all?

13       A.    No.

14       Q.    Did these kilos of cocaine come back into

15   your possession at any time?

16       A.    Yes.

17       Q.    When did they come back into your possession?

18       A.    Approximately five minutes later.

19       Q.    Were they in substantially the same

20   condition?

21       A.    This particular kilo of cocaine, what I did

22   was to hide the stains from the original

23   investigation, I wrapped it in newspaper with black

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR SUSSEX COUNTY

STATE OF DELAWARE

    VS.

ARTEL J HOPKINS

Alias: JERMAINE A HOPKINS

DOB: 07/12/1972
SBI: 00254263

CASE NUMBER:             CRIMINAL ACTION NUMBER:
0402002032               S04-02-0653I
                      TRF.COC.>100 GR(F)
                      S04-02-0654I
                      PWITD NSII CS(F)
                      S04-02-0655I
                      MAINT BUILDING(F)
                      S04-02-0656I
                      CONSP 2ND(F)
                      S04-02-0657I
                      POSS DRUG PARAP(M)

### SENTENCE ORDER

NOW THIS 12TH DAY OF NOVEMBER, 2004, IT IS THE ORDER OF
THE COURT THAT:

The defendant is adjudged guilty of the offense(s) charged.
The defendant is to pay the costs of prosecution and all
statutory surcharges.


**AS TO  S04-02-0653-I : TIS**
**TRF.COC.>100 GR**

 The defendant is to pay a fine in the amount of $400000.00
of which $400000.00  is suspended (see attachment).

**Effective November 12, 2004  the defendant is sentenced
as follows:**

 - The defendant is placed in the custody of the Department
of Correction for 25 year(s) at supervision level 5 with
credit for 284 day(s) previously served


 - Suspended after serving 15 year(s)  at supervision level
5

\*\*APPROVED ORDER\*\*    1    November 12, 2004 13:11

A- 45

STATE OF DELAWARE
        VS.
ARTEL J HOPKINS
DOB: 07/12/1972
SBI: 00254263

- For 6 month(s)  supervision level 4 **WORK RELEASE**

- Followed by 1 year(s)  at supervision level 3

- Hold at supervision level 5

- Until space is available at supervision level 4 **WORK RELEASE**

The first 8 years  of this sentence is a mandatory term of incarceration pursant to DE164753AA2CFB .

Probation is concurrent to any probation now serving.

**AS TO  S04-02-0654-I : TIS**
**PWITD NSII CS**

The defendant is to pay a fine in the amount of $5000.00 of which $5000.00  is suspended (see attachment).

- The defendant is placed in the custody of the Department of Correction for 10 year(s) at supervision level 5

- Suspended after serving 3 year(s)  at supervision level 5

- For 18 month(s)  supervision level 3

The first 3 years  of this sentence is a mandatory term of incarceration pursant to DE164751000CFC .

Probation is concurrent to any probation now serving.

**AS TO  S04-02-0655-I : TIS**
**MAINT BUILDING**

- The defendant is placed in the custody of the Department of Correction for 3 year(s) at supervision level 5

- Suspended for 18 month(s)  at supervision  level 2

\*\*APPROVED ORDER\*\*    2    November 12, 2004 13:11

*A - 46*

STATE OF DELAWARE
      VS.
ARTEL J HOPKINS
DOB: 07/12/1972
SBI: 00254263

 Probation is concurrent to any probation now serving.

 AS TO  S04-02-0656-I : TIS
 CONSP 2ND

 - The defendant is placed in the custody of the Department
of Correction for 2 year(s) at supervision level 5

 - Suspended for 1 year(s)  at supervision  level 2

 Probation is concurrent to any probation now serving.

 AS TO  S04-02-0657-I : TIS
 POSS DRUG PARAP

 - The defendant is placed in the custody of the Department
of Correction for 1 year(s) at supervision level 5

 - Suspended for 1 year(s)  at supervision  level 2

 Probation is concurrent to any probation now serving.

A- 47

## SPECIAL CONDITIONS BY ORDER

**STATE OF DELAWARE**
**VS.**
**ARTEL J HOPKINS**
**DOB: 07/12/1972**
**SBI: 00254263**

CASE NUMBER:
0402002032

The defendant shall pay any monetary assessments ordered during the period of probation pursuant to a schedule of payments which the probation officer will establish.

Have no contact with Pedro Marte

Have no contact with codef., Raymond Bacon

While at Level 3, the defendant shall perform 5 hour(s) to 35 hours of community service per week unless fully employed.

Obtain and remain gainfully employed.

Should the defendant be unable to complete financial obligations during the period of probation ordered, the defendant may enter the work referral program until said obligations are satisfied as determined by the Probation Officer.

Be evaluated for substance abuse and follow any recommendations for counseling, testing or treatment deemed appropriate.

Defendant loses driving licenses/privileges pursuant to statute .

JUDGE RICHARD F STOKES

**APPROVED ORDER**      4      November 12, 2004 13:11

A - 48

## PROOF OF SERVICE

I, _Artel Hopkins_, declare: I am a resident of Sussex
Correctional Institution, in the county of Sussex, State of
Delaware.

On _December 30_ , 2007, I served the attached: **Petitioner's
Habeas Corpus Appendix** on theparties herein by placing true
correct copies thereof, enclosed in a sealed envelope, with
postage thereon fully paid, in the United States Mail in a
deposit box so provide at the above-named correctional institution
in which I am presently confined, and forward to :

Beau Biden
Atorney General
State of Delaware
844 North French St., 6th Fl.
Wilmington, DE  19801

Dated: _12/30/07_                         _Artel Hopkins_